# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ALFRED BANKS, ET AL.,**<br><br>       Plaintiffs,<br><br>  vs.<br><br>**COUNTY OF SAN MATEO,**<br><br>      Defendant. | **OMNIBUS ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS**[1]<br><br>CASE NO. 16-CV-04455-YGR |
| **MICHAEL THATCHER, ET AL.,**<br><br>       Plaintiffs,<br><br>  vs.<br><br>**COUNTY OF SANTA CLARA,**<br><br>      Defendant. | CASE NO. 16-CV-4781-YGR |
| **CHARLENE HARRIS, ET AL.,**<br><br>       Plaintiffs,<br><br>  vs.<br><br>**COUNTY OF CONTRA COSTA,**<br><br>      Defendant. | CASE NO. 16-CV-4795-YGR |
| **JACQUELYNNE M. CLARK-RUSSELL, ET AL.,**<br><br>       Plaintiffs,<br><br>  vs.<br><br>**COUNTY OF ALAMEDA,**<br><br>      Defendant. | CASE NO. 16-CV-4816-YGR |

---

[1] The above-captioned cases were each filed in the Northern District of California. On October 24, 2016, all of the cases were reassigned to this Court in the interest of avoiding duplication of effort and conserving judicial resources. On November 28, 2016, the Court held a conference and set forth a consolidated briefing schedule for all of the defendants to file motions to dismiss.

Unless otherwise specified, the docket numbers and documents referenced herein shall refer to the docket in *Banks v. County of San Mateo*, Case No. 16-CV-4455 (N.D. Cal.).

## INTRODUCTION

The above-captioned putative class actions have been brought by plaintiffs[2] against defendant counties of San Mateo, Santa Clara, Contra Costa, and Alameda for alleged Sherman Act antitrust and Section 1983 violations related to exclusive grants of telephone servicing contracts inside county prison facilities that have allegedly resulted in grossly excessive commissions for such services. Specifically, plaintiffs bring a cause of action for (i) an illegal agreement to restrain trade pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. section 1; and three claims under 42 U.S.C section 1983 for alleged violations of constitutional provisions, namely (ii) the First Amendment rights of association; (iii) Fifth Amendment protections against unconstitutional conditions and unlawful takings; and (iv) Fourteenth Amendment guarantees of equal protection.

Now before the Court are motions to dismiss from each of the defendants in the above-captioned actions.[3] Defendants argue that dismissal is appropriate based on the following theories: (i) preemption pursuant to the Tax Injunction Act, 28 U.S.C. section 1341 ("TIA"); (ii) failure to join indispensable parties, pursuant to Federal Rule of Civil Procedure 12(b)(7); and (ii) failures to state a claim under either the Sherman Act or Section 1983, pursuant to Rule 12(b)(6).

Having carefully considered the pleadings, the papers and exhibits submitted, and the parties' arguments at the hearing held on March 21, 2017, and for the reasons set forth more fully below, the Court **GRANTS IN PART** defendants' motion as follows: The Court **DISMISSES WITH PREJUDICE** the entire action, except for plaintiffs' First Amendment claim. Out of an abundance

---

[2] Plaintiffs are inmates and their families, and defendants are the counties that operate the county jails. To the extent the Court references specific allegations, the cases are referred to as follows: first, *Banks v. San Mateo*, No. 16-CV-4455, Dkt. No. 37 ("Banks/San Mateo Second Amended Complaint" or "Banks/San Mateo SAC"); second, *Thatcher v. Santa Clara*, No. 16-CV-4781, Dkt. No. 31 (addressing a first amended complaint ("FAC"), the "Thatcher/Santa Clara FAC"); third, *Harris v. Contra Costa*, No. 16-CV-4795, Dkt. No. 24 ("Harris/Contra Costa FAC"); and finally, *Clark-Russell v. Alameda*, No. 16-CV-4816, Dkt. No. 25 ("Clark-Russell/Alameda FAC").

[3] On March 7, 2017, plaintiffs filed an administrative motion for leave to file a sur-reply to address defendants' arguments regarding the Tax Injunction Act, raised for the first time in their reply brief. Good cause having been shown, the Court **GRANTS** plaintiffs' motion for leave to file a sur-reply and considers in full plaintiffs' arguments in their filing at Docket Number 53-2 as their sur-reply.

United States District Court
Northern District of California

of caution, the Court will provide leave to determine whether any amendment can, in fact, be

made, as to that claim only.[4]

## BACKGROUND

Plaintiffs allege generally that they are charged "grossly unfair and excessive phone

charges," which are "nothing but money making schemes . . . to force family members desperately

trying to maintain contact with their inmate husbands, parents[,] and children to pay for totally

unrelated jail expenses or give up their primary lifeline of communication." (SAC ¶ 1.) More

specifically, plaintiffs allege:

---

[4] The parties each filed requests for judicial notice in connection with their papers on the instant motions. Defendants seek notice of the following documents (Dkt. Nos. 42 ("DRJN") and 52 ("SDRJN")): (i) Exhibit A, FCC 12-167 Notice of Proposed Rulemaking; (ii) Exhibit B, FCC 13-114 Report and Order and Further Notice of Proposed Rulemaking; (iii) Exhibit C, FCC 15-136, Second Report and Order and Third Further Notice of Proposed Rulemaking; (iv) Exhibit D, FCC 16-102, Order on Reconsideration; (v) Exhibit E, Class Action Complaint, *Mojica v. Securus Techs., Inc.*, No. 14-CV-5258-TLB (W.D. Ark. Aug. 14, 2014); (vi) Exhibit F, *Jacobs v. Global Tel\*Link Corp.*, No. 15-CV-5136-TLB (W.D. Ark. June 12, 2015); (vii) Exhibit G, Coordinated Petitions filed in *Securus Techs., Inc. v. FCC*, No. 13-1280 (D.C. Cir. Nov. 14, 2013) and *Global Tel\*Link v. FCC*, No. 13-1281 (D.C. Cir. Nov. 14, 2013); (viii) Exhibit H, Joint Brief for ICS Carrier Petitioners, 2016 WL 3194576 (D.C. Cir. June 6, 2016); (ix) Exhibit I, Motion, *Mojica et al. v. Securus Techs., Inc.*, No. 14-CV-5258-TLB (W.D. Ark. Sept. 15, 2014); (x) Exhibit J, Memorandum, *Jacobs v. Global Tel\*Link Corp.*, No. 15-CV-5136-TLB (W.D. Ark. Aug. 17, 2015); (xi) Exhibit K, Request for Proposals ("RFP") for San Mateo County Inmate Telephone Services, dated November 15, 2012; (xii) Exhibit L, RFP for San Mateo County Inmate Telephone Services, dated February 1, 2007; (xiii) Exhibit M, RFP Department of Correction Santa Clara County; (xiv) Exhibit N, Contra Costa Agreement with Global Tel\*Link; (xv) Exhibit O, Contra Costa Third Amendment to Agreement with Global Tel\*Link; (xvi) Exhibit P, FCC Inmate Telephone Service Guide; and (xvii) SDRJN Exhibit A, Alameda Contract Amendment with Global Tel\*Link.

Defendants argue that each of these documents is noticeable because each "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Specifically, Exhibits E–J are court records, *see Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012); Exhibits A–D & P are federal agency records, *see Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069–70 (9th Cir. 1995); and Exhibit K–O and SDRJN Ex. A are public county contracting records, *see Nat. Res. Def. Council v. Kempthorne*, 539 F. Supp. 2d 1155, 1167 (E.D. Cal. 2008). Plaintiffs oppose only Exhibits K, L, and M, arguing that the truth of the contents of such documents and the manner in which the bidding actually occurred are in dispute. The Court finds that the documents presented are properly subject to judicial notice, but the Court does not accept as true the statements made in such documents.

Plaintiffs seek judicial notice of the following: (a) Exhibit 1, Santa Clara and Global Tel\*Link contract; (b) Exhibit 2, Second Amendment to Santa Clara and Global Tel\*Link contract; (c) Exhibit 3, Alameda and Global Tel\*Link contract; and (d) Exhibit 4, Amendment to San Mateo and Securus contract. Defendants do not oppose. The Court takes notice of the existence of such contracts, but not of any facts contained therein. *Id.*

The phone systems at issue are commonly referred to as an Inmate Calling System ("ICS"). Each of the counties in these cases entered into exclusive contracts granting control over the ICS to a singular telecommunication company. The ICS is the exclusive method through which inmates can communicate by phone to those outside the prison, and thus, they and their family members must use the telecommunication company chosen by the county.

These contracts, in turn, provide that such companies pay commissions to the counties. (Banks/San Mateo SAC ¶ 5 (alleging that San Mateo receives a guaranteed $795,000 annually); Thatcher/Santa Clara FAC ¶ 5 (Santa Clara allegedly receiving $1.7 million annually); Harris/Contra Costa FAC ¶ 5 (Contra Costa allegedly receiving $4.2 million annually); *Clark-Russell/Alameda* FAC ¶ 5 (Alameda allegedly receiving $1.5 million annually or 70.5% of receipts, whichever is higher)). Plaintiffs allege that "without the commissions, the charges would be substantially lower, and they bear no reasonable relationship to the actual cost of providing the ICS service." (SAC ¶ 29.)

In Banks/San Mateo, plaintiffs allege that Mrs. Banks pays between $300 and $350 per month in phone charges, and had to go out of retirement in order to pay for the phone calls. (Banks/San Mateo ¶ 26.) The County of San Mateo entered into exclusive contracts with Global Tel*Link Corporation ("GTL") from November 2007 through March 2013, and Securus Technologies Inc. ("Securus") from April 2013 to the present. (*Id.* ¶ 27.)

In Thatcher/Santa Clara, the named plaintiffs allege that they have paid many hundreds of dollars to GTL since their son's incarceration. (*Thatcher/Santa Clara* FAC ¶ 25.) The County of Santa Clara entered into exclusive contracts with GTL from December 2010 through the present. (*Id.* ¶ 26.)

In Harris/Contra Costa, the named plaintiffs have also alleged they paid hundreds of dollars to GTL. (*Harris/Contra Costa* FAC ¶ 27.) The County of Contra Costa entered into exclusive contracts with GTL from July 2008 through the present. (*Id.* ¶ 28.)

Finally, in Clark-Russell/Alameda, plaintiffs claim to have paid many hundreds of dollars to GTL. (*Clark-Russell/Alameda* FAC ¶ 27.) The County of Alameda entered into an exclusive

contract with Pacific Bell from 1995 through 2007, and in October 2007, GTL assumed that contract, which it holds through the present. (*Id.* ¶ 28.)

Central to the dispute at hand is the California statutory authority which authorizes the defendants to act. The Court outlines it here: California Penal Code section 4000 designates county jails as a public facility to be "kept by the sheriffs of the counties in which they are respectively situated." The parties do not dispute that this broad authorization includes the counties' ability to establish exclusive contractual relationships with telephone communication service providers in county prisons. The penal code specifically contemplates the charging of commissions from telephone companies, but limits its use for specific purposes:

> There shall be deposited in the inmate welfare fund any money, refund, rebate, or commission received from a telephone company or pay telephone provider when the money, refund, rebate, or commission is attributable to the use of pay telephones which are primarily used by inmates while incarcerated.

Cal. Penal Code § 4025(d). The statute further directs that the money deposited in the "inmate welfare fund shall be expended by the sheriff primarily for the benefit, education, and welfare of the inmates confined within the jail." *Id.* § 4025(e) The statute also provides that any funds not needed for the welfare of inmates may be expended for maintenance of jail facilities, including the "salary and benefits of personnel used in the programs to benefit the inmates," such as "education, drug and alcohol treatment, welfare, library, accounting, and other programs deemed appropriate by the sheriff." *Id.* "Inmate welfare funds *shall not* be used to pay required county expenses of confining inmates in a local detention system, such as meals, clothing, housing, or medical services or expenses, except that inmate welfare funds may be used to augment those required county expenses as determined by the sheriff to be in the best interest of inmates." *Id.* (emphasis supplied).

Plaintiffs allege that the exorbitant commissions received by defendants from the telephone communications companies result in higher phone rates charged to inmates and the call recipients. On this basis, plaintiffs seek, among others, to enjoin defendants from "renewing, or entering into new, ICS contracts under which it receives commissions or fees that exceed the reasonable cost of providing the service of allowing telephone access cost after determination of such costs by the

court" and prohibiting defendants, "while the current challenged contract[s] remain[] in effect, from using the commissions it receives under the contract[s] for any purpose other than placement in a court supervised fund for any purpose other than ultimately restoring such funds back to the class members who paid charges from which said commissions were taken to the extent of said commissions." (*See* Banks/San Mateo SAC § XI, ¶ 4.)

The plaintiffs in each action seek to certify the following classes:[5]

**General Rule 23(b)(2) Class**: Those individuals or entities that qualify as either a) a past, present or future [defendant] County Jail inmate for whom a third party ICS account was in the past or present, or in the future will be, established or b) a Call Recipient, i.e., inmates' family, friends, bailbondsmen, legal counsel, or others, who in the past or present has established, or will in the future establish, a pre-paid ICS account with a telecommunications company (currently [Securus] [GTL]) that has contracted with the [defendant] County to provide third party phone accounts for phone access to County Jail inmates, from which pre-paid accounts phone charges and administrative or other fees for calls with inmates housed or confined in any [defendant] County Jail Facility are paid, and out of which collected funds the County of [defendant] is paid commissions pursuant to its contract with the telecommunications company.

**General Rule 23(b)(3) Class**: Those individuals or entities, through the earlier of the complete cessation of the challenged conduct or the final resolution of this case, that qualify as either a) a past or present [defendant] County Jail inmate for whom a third party ICS account was established, or b) a Call Recipient, i.e. inmates' family, friends, bailbondsmen, legal counsel, or others, who in the past or present has established, or will in the future establish, a pre-paid ICS account with a telecommunications company (currently [Securus] [GTL]) that has contracted with the County of [defendant] to provide third party phone accounts for phone access to County Jail inmates, from which pre-paid accounts the phone charges and administrative or other fees for calls with inmates housed or confined in any County of [defendant] Jail Facility are paid, and out of which collected funds the County of [defendant] is paid commissions pursuant to its contract with the telecommunications company.

Additionally, the complaints refer to the General Class Members who qualify as Call Recipients collectively as the "Call Recipient Class Members," and those who qualify as inmates collectively as "Inmate Class Members." (*See, e.g.*, Banks/San Mateo SAC ¶ 39.)

---

[5] *See* Banks/San Mateo SAC ¶¶ 40–41; Thatcher/Santa Clara FAC ¶¶ 40–41; Harris/Contra Costa FAC ¶¶ 41–42; Clark-Russell/Alameda FAC ¶¶ 43–44.

**LEGAL FRAMEWORK**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal for failure to state a claim under Rule 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the facts alleged do not support a reasonable inference of liability, stronger than a mere possibility, the claim must be dismissed. *Id.* at 678–79; *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (stating that a court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences").

"Federal Rule of Civil Procedure 8(a)(2) requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 554–55 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original). Even under the liberal pleading standard of Rule 8(a)(2), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (internal brackets and quotation marks omitted)). The Court will not assume facts not alleged, nor will it draw unwarranted inferences. *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Defendants have raised several arguments in support of their motions to dismiss. First, defendants argue that the complaints should be dismissed in their entirety because (a) the actions are wholly preempted by the Tax Injunction Act and (b) plaintiffs failed to join indispensable parties, pursuant to Federal Rule of Civil Procedure 12(b)(7). Second, defendants contend that plaintiffs have also failed to state a claim with respect to each of their causes of action, further warranting dismissal of the complaints. The Court addresses each, below.

## I. MOTIONS TO DISMISS ACTIONS IN THEIR ENTIRETY

### A. TAX INJUNCTION ACT

Plaintiffs have asserted for purposes of their First Amendment arguments that the commission fees are, essentially, taxes on the exercise of their constitutionally protected rights. Defendants countered that, if such were the case, the Court would lack jurisdiction over the entire matter pursuant to the TIA. Specifically, the TIA provides thus: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341.[6] On such bases, defendants assert that the Court should dismiss the entire action.

The Ninth Circuit has established three primary factors in determining whether a certain charge or assessment constitutes a tax for the purposes of the TIA, namely whether: (i) the entity that imposes the assessment is a legislative body; (ii) the group upon whom the assessment is imposed is broad; and (iii) assessments are treated as general revenues and are paid into the state's general fund. *See Bidart*, 73 F.3d at 930–32. "Where the first two factors are not dispositive, courts examining whether an assessment is a tax 'have tended . . . to emphasize the revenue's ultimate use.'" *Id.* (quoting *San Juan Cellular Telephone Co. v. Public Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992)).

---

[6] The TIA was enacted in 1937 based on concerns that, if injunctive relief from state taxes were available, "state tax administration might be thrown into disarray," and "'[d]uring the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency.'" *Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 929–30 (9th Cir. 1996) (quoting *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 527 (1981)).

### 1. *Entity Imposing the Assessment*

First, an "assessment imposed directly by the legislature is more likely to be a tax than an assessment imposed by an administrative agency." *Id.* at 931. The parties agree that the counties' boards of supervisors are the bodies that impose the assessment here, by virtue of their authority to negotiate and enter into contracts with the telecommunications companies.[7] However, whether they do so in their legislative or executive capacities remains in dispute. *See People v. El Dorado Cty. Supervisors*, 8 Cal. 58, 62 (1857) ("The word 'supervisors,' when applied to county officers, has legal signification. The duties of the officer are various and manifold; sometimes judicial, and at others, legislative and executive."); *see also Sacramento Newspaper Guild v. Sacramento Cty. Bd. of Supervisors*, 263 Cal. App. 2d 41, 48 (1968) ("[A] board of supervisors actually performs legislative, executive and even quasi-judicial functions.").

None of the parties provides support for their position. The Court's own review of the case law indicates that a county's awarding of a contract is, at least, a quasi-legislative act. *See Kucharczyk v. Regents of Univ. of Cal.*, 946 F. Supp. 1419, 1435–36 (N.D. Cal. 1996) ("While generally a quasi-legislative act is one in which the agency formulates a rule to be applied to all future cases, and an adjudicatory act is one in which a rule is applied to a specific set of existing facts, in California, '[i]t has long been established that the 'award of a contract, and all of the acts leading up to the award, are legislative in character.'" (citations omitted)); *see also Joint Council of Interns & Residents v. Bd. of Supervisors*, 210 Cal. App. 3d 1202, 1212 (1989) (holding that the board was engaged in "legislative or quasilegislative function when it considered and approved the county's contract"). Accordingly, the Court finds that this factor weighs in favor of a finding that the commissions associated with the contracts here are taxes under the TIA.

### 2. *Parties Upon Whom Assessment Is Imposed*

Second, an "assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class." *Bidart*, 73 F.3d at 931 (citing *Trailer Marine*

---

[7] Plaintiffs also argued that the TIA applies only to state, rather than county actions and assessments. However, it is well-settled that the TIA can apply to assessments imposed by county boards. *See Bidart*, 73 F.3d at 931 (discussing case where county board's imposition of a health tax was found to be covered by the TIA).

*Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 6 (1st Cir. 1992) (explaining that the fact that fees used to compensate automobile accident victims were "collected only from those seeking the privilege of driving on state highways" weighed in favor of finding that the fees were *not* taxes under the TIA)). Here, the fees are imposed only upon inmates and those seeking to communicate with the inmates, as opposed to the broader population, generally. *See, e.g.*, *Wright v. Riveland*, 219 F.3d 905, 911 (9th Cir. 2000) (holding that a certain deduction imposed only on "inmates who receive funds from outside sources" constituted a select group for purposes of the *Bidart* analysis); *Page v. Wyandotte*, 666 F. App'x 390, 393 (6th Cir. 2016) (finding that the "class of persons who pay each franchise fee is actually narrowly focused, including only those who voluntarily receive the respective utility service"). Accordingly, the Court finds that this factor weighs against finding that the commissions constitute taxes under the TIA as the assessment only concerns the limited groups who use the ICS.

### 3.    *"Ultimate Use" of the Assessment*

Finally, "[a]ssessments treated as general revenues and paid into the state's general fund are taxes," whereas an "assessment placed in a special fund and used only for special purposes is less likely to be a tax." *Bidart*, 73 F.3d at 932. Courts have placed particular emphasis on this factor when the first two are not dispositive. *Id.*

As shown in the statutory framework outlined above, no dispute exists that the commissions at issue here were earmarked for the inmate welfare fund rather than a general fund. The statute then details the types of inmate welfare expenditures to which the commissions can be applied. *See Cruise Lines Int'l Assoc. of Alaska v. Juneau, Alaska*, No. 16-CV-0008-HRH, 2016 WL 5660360, at *4 (D. Alaska Sept. 29, 2016) (finding that the third factor weighed against application of TIA even when funds were sometimes used for general revenue because they were intended by law to be used for specific purposes). Accordingly, the Court finds that this factor weighs against a finding that the fees constitute a tax for purposes of TIA.

Thus, the balance of the factors weighs against the application of the TIA, given that the fees here are imposed on a narrow class of users and are used specifically for the inmate welfare

fund, rather than general state or county revenue.  No allegation has been made to the contrary.

Therefore, the Court **DENIES** defendants' motion to dismiss on this ground.

### B. FAILURE TO JOIN INDISPENSABLE PARTIES

Defendants have moved to dismiss the entire action for failure to join the telecommunication companies, GTL and Securus.  Rule 12(b)(7) permits a defendant to move for dismissal on the ground that the plaintiff failed to join a required party under Rule 19.  Under Rule 19, a "required party" must be joined if either (a) the court cannot afford complete relief absent such parties or (b) disposing of the action in that party's absence may impair or impede their ability to protect their interests or leave an existing party subject to a substantial risk of incurring multiple or otherwise inconsistent obligations because of the interest.  Defendants submit the second justification exists here.

The Ninth Circuit has "consistently held that only 'legally protected' interests warrant protection under Rule 19."  *Ward v. Apple Inc.*, 791 F.3d 1041, 1051 (9th Cir. 2015).  Thus, to prevail, defendants must demonstrate that (i) the telecommunication companies have a "legally protected" interest that (ii) may be impeded or impaired by the disposition of this action without their participation.  Additionally, joinder is "contingent . . . upon an initial requirement that the absent party *claim* a legally protected interest relating to the subject matter of the action."  *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999) (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043 (9th Cir. 1983)) (emphasis in original); *see also Ward*, 791 F.3d at 1051 (reaffirming rule stated in *Bowen* that joinder is not required where the absent party is aware of the action but chooses not to claim an interest).

Defendants have failed to satisfy their burden.  They have failed to demonstrate that the telecommunication companies have claimed an interest in this litigation, which is dispositive.  *See Bowen*, 172 F.3d at 689.  Defendants argue only that, while the telephone companies have not specifically claimed an interest in these cases, they have asserted an interest in similar proceedings, including similar class actions filed in the Western District of Arkansas and in Federal Communications Commission proceedings related to the reasonableness of ICS rates. Defendants, however, have provided no authority—and the Court is aware of none—supporting

the proposition that participation in other matters with potentially similar issues satisfies the requirement that the absent party has claimed an interest for the purposes of joinder.

Thus, because the Court finds that defendants have not satisfied this requirement, the Court need not address the remaining factors in the Rule 12(b)(7) analysis. Accordingly, the Court **DENIES** defendants' motion to dismiss on this ground.

## II. MOTIONS CHALLENGING SPECIFIC CLAIMS

### A. SHERMAN ACT ANTITRUST CLAIM

As a threshold matter, defendants contend that plaintiffs' claims under the Sherman Act are wholly barred by the state action doctrine, which bars antitrust claims against state actors. Under *Parker v. Brown*, 317 U.S. 341 (1943), state actions are exempt from the federal antitrust laws. The Court provides a summary of the general principles behind federal antitrust laws and the state action doctrine.

"Federal antitrust law is a central safeguard for the Nation's free market structures." *N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 135 S. Ct. 1101, 1109 (2015) (citing *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972) (stating that antitrust laws are "as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms")). "The antitrust laws declare a considered and decisive prohibition by the Federal Government of cartels, price fixing, and other combinations or practices that undermine the free market." *Id.*

The state action doctrine stems from basic principles of federalism and state sovereignty. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 37–39 (1985). In *Parker*, the Supreme Court found that while the Sherman Act provided controls on private restraints on trade, the intent was not to "nullify a state's control" over its own activities as a sovereign entity. *Parker*, 317 U.S. at 351. "That ruling recognized Congress' purpose to respect the federal balance and to 'embody in the Sherman Act the federalism principle that the States possess a significant measure of sovereignty under our Constitution.'" *N. Carolina*, 135 S. Ct. at 1110 (citations omitted). While municipalities are not themselves sovereigns, the progeny of this doctrine has effectively embraced them within the purview of the state where it is shown that the municipality is acting

pursuant to a "clearly articulated and affirmatively expressed . . . state policy" authorizing them to "displace competition with regulation or monopoly public service." *Town of Hallie*, 471 U.S. at 39 (citing *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 412 (1978)). Analytically, no distinction exists for these purposes between a municipality and a county. While *Lafayette* articulated a second prong to the test, namely that the entity be "actively supervised by the state," it did not address that issue, and the Supreme Court in *Town of Hallie* later dismissed it as unnecessary where municipalities were the actors. *Id.* at 46–47 ("We now conclude that the active state supervision requirement should not be imposed in cases in which the actor is a municipality."). "Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function." *Id.* at 47.

The fundamental inquiry, therefore, is to determine "how clearly a state policy must be articulated for a municipality to be able to establish that its anticompetitive activity constitutes state action." *Id.* at 40. The Supreme Court found that legislatures need not "catalog all of the anticipated effects of [the] statute" authorizing the conduct at issue. *Id.* at 42. Rather, the inquiry need only demonstrate that "anticompetitive effects logically would result from [the] broad authority" afforded to the municipality. *Compare Town of Hallie*, 471 U.S. at 41–43 (holding that anticompetitive conduct relating to sewage services for unincorporated areas was entitled to state action immunity, where the statute not only granted authority to contract, add, alter, and repair sewage services, but also delineate the districts to be served) *with Community Comm'cs Co., Inc. v. City of Boulder*, 455 U.S. 40, 53, 55–56 (1982) (holding that a "Home Rule Amendment" generically vesting a "guarantee of local autonomy" was insufficient to satisfy the state action doctrine with respect to city's anticompetitive regulations in the cable television industry).

Here, the statutory language authorizes the county sheriffs not only to manage and keep the jails situated in their counties, but to receive commissions from telecommunication providers, and directs the county jails on how to use such commissions, as set forth above. Cal. Penal Code § 4000; Cal. Penal Code § 4025(d). While plaintiffs concede that this grant of authority includes the right to enter into exclusive contracts with the telecommunications companies, they attempt to

13

reframe the issue by suggesting that state authority does not allow defendants to use their "market control over the jails to enrich themselves at the expense of the phone service end consumers (inmates and call recipients), [or to enter] into an exclusive agreement with the phone company willing to pay the highest kickback to the county." (*See Banks/San Mateo* SAC ¶ 92.) Said differently, plaintiffs challenge not the charging of the rate itself, but the "exorbitant" rates, *i.e.* the scope of the charging.

In analyzing the claim, the Court's inquiry focuses on the nature of the mandate authorized by the State. "So long as the restraint is a 'foreseeable result' which results logically from a broad grant of regulatory authority to a city, the 'clear articulation' requirement is satisfied." *Kern-Tulare Water Dist. v. Bakersfield*, 828 F.2d 514, 518–19 (9th Cir. 1987); *see also Town of Hallie*, 471 U.S. at 47; *Arsberry v. Illinois*, 244 F.3d 558, 566 (7th Cir. 2001) ("States and other public agencies do not violate the antitrust laws by charging fees or taxes that exploit the monopoly force that is the definition of government.").[8] In service of that analysis, the Court provides a brief review of the legislative history of section 4025 of the Penal Code, which relates to the collection of commissions from telephone companies:

Section 4025 was added to the Penal Code in May 1949. Stats. 1949, c.416, p. 763, § 1. Originally, that statutory framework did not provide for commissions from telephone companies. Rather, the code only contemplated the establishment and maintenance of an in-prison store,

---

[8] Prior to *Town of Hallie* and currently in other contexts, the Supreme Court applied a two-prong test to determine whether the state action doctrine barred liability for antitrust claims under the Sherman Act. Specifically, the Supreme Court required both (i) a clear articulation of an affirmatively expressed policy and (ii) active supervision by the State. *See N. Carolina*, 135 S. Ct. at 1110. The supervision rule stemmed "from the recognition that '[w]here a private party is engaging in anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.'" *Id.* at 1112 (citation omitted). In *Town of Hallie*, the Supreme Court exempted municipalities from the "active supervision" requirement holding that municipalities are subject exclusively to the "clear articulation" requirement. The Supreme Court reasoned that the prong was not necessary in such cases because there was "little or no danger that [a municipality would be] involved in a *private* price-fixing arrangement. The only real danger [was] that it [would] seek to further purely parochial public interests at the expense of more overriding state goals." *Town of Hallie*, 471 U.S. at 47 (emphasis in original). It found the danger, however, to be minimal "because of the requirement that the municipality act pursuant to a clearly articulated state policy." *Id.* The Court can conceive of situations in which the justification for exempting municipalities from the "active supervision" requirement do not apply. This, however, is not that case.

specifically allowing the sheriff to earn a profit from such sales and directing that those profits be placed in an inmate welfare fund. *Id.* In September 1987, the legislature re-crafted section 4025(d) to expand the earmarking of not just "money and property" but any "money, refund, rebate, or commission received" from telephone companies. Stats. 1987, c. 1217, § 1.[9] The expansion of section (d) was intended to prescribe the use of monies, which the counties were already collecting from inmate telephone use. State Senator Joseph Montoya explained thus in his letter requesting that the governor sign the bill: "Currently[,] telephone companies pay rebates to counties based on profits generated through inmate telephone use. In some counties these rebates are deposited into the inmate welfare fund and in others into a county general fund. . . . [The legislation] would require the deposit of these telephone rebates into the Inmate Welfare Fund if the rebate was generated by inmates." S.B. 1115, c. 1987, Sept. 14, 1987 Letter. At the time, the legislature and the governor were aware that these receipts generated revenues for the counties: "The telephones do generate revenue based on commissions paid by the telephone company for the business obtained from the inmates and people they call. The commissions are basically the same type of revenue which is generated from sales in the jail inmate store. Existing law (Penal Code Section 4025) requires that profits from the jail inmate store be placed in the Inmate Welfare Fund." S.B. 115, c. 1987, Sept. 25, 1987 Board of Corrections Recommendation.

In light of this statutory background, and the lack of any allegations to the contrary, the Court finds that the alleged anticompetitive conduct here—*i.e.*, the charging of allegedly "exorbitant" commissions—is protected from the antitrust laws by the state action doctrine.[10] At

---

[9] In 1989, section (d) was further amended to include not only telephone companies but also "pay telephone provider(s)" to correct an apparent gap in the statute. Stats. 1989, c. 127.

[10] In any event, the Court finds that the conduct of which plaintiffs complain further fails to state a claim under section 1 of the Sherman Act. "A claim under Section 1 of the Sherman Act requires proof of 'concerted action,' defined as having a conscious commitment to a common scheme designed to achieve an unlawful objective. Concerted, multilateral action in violation of the Act occurs when two or more entities that previously pursued their own interests separately combine to act as one for their common benefit in the restraint of trade." 54 Am. Jur. 2d Monopolies and Restraints of Trade § 31 (2d ed. 2017). "Sherman Act § 1 prohibits conspiracies and agreements that unreasonably restrain trade." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989). To establish a Section 1 claim, a plaintiff must demonstrate the following three elements: "(1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain

15

the time the specific provision in the California Penal Code prescribing the use of such commissions was enacted, the state legislature and governor were aware of the fact that counties were exacting commissions and rebates from the telecommunication companies. Rather than place limits on the collection of those commissions, the legislature instead simply directed that the use of such commissions be earmarked for the inmate welfare fund. Section 4025 has since been amended four times, without any effort to place limitations on the counties' ability to collect commissions or rebates from the telephone companies with which they contract to provide these services.

The defendants' uncontested authority to enter into monopolistic contracts coupled with the legislature's recognition that such contracts lead to rebates and commissions demonstrates that the legislature "contemplated the kinds of actions alleged to be anticompetitive," namely the charging of allegedly high commissions that results in higher telephone prices. *Town of Hallie*, 471 U.S. at 44; *see also Kern-Tulare*, 828 F.2d at 518–19; *Preferred Comm'cs., Inc. v. Los Angeles*, 754 F.2d 1396, 1412–15 (9th Cir. 1985) (holding that legislation that permitted "cities to franchise cable systems and to consider accepting consideration other than cash in awarding the franchise" was sufficient to allow the city to "eliminate competition among cable operators by limiting the number of franchises it issues"); *Michigan Paytel J. Venture v. Detroit*, 287 F.3d 527, 536 (6th Cir. 2002) (holding in summary judgment that the state's grant of authority "to bid out public contracts and to contract for the maintenance of its prisons" satisfied the standard for state action immunity because anticompetitive effects are the logical and foreseeable result). The

---

competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e., 'antitrust injury')." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988).

Plaintiffs concede that defendants have the authority to enter into exclusive contracts with a single telephone company or provider. There is, therefore, no unlawful intent to harm or unreasonably restrain competition. Rather, as the Seventh Circuit explained in a similar case:

Indeed, the plaintiffs' real argument has nothing to do with any horizontal conspiracy; it is rather that a monopolist, namely the State of Illinois (and its subdivisions), exercising as it does an iron control over access to the inmate market, has rented pieces of the market to different phone companies . . . . States and other public agencies do not violate the antitrust laws by charging fees or taxes that exploit the monopoly force that is the definition of government.

*Arsberry*, 244 F.3d at 566.

complaints do not allege the legislature intended to limit the authority of the counties in their ability to set the terms of the contracts with the telephone providers or to collect commissions.[11]

Therefore, the Court finds that the state action doctrine bars plaintiffs' antitrust claim against defendants. Accordingly, the Court **GRANTS** defendants' motion on this claim.

### B.    SECTION 1983 CLAIMS

#### 1.    *First Amendment—Right to Communicate*

Plaintiffs also challenge the commissions charged by defendants as a violation of their First Amendment rights. Specifically, plaintiffs argue that the Ninth Circuit has recognized a First Amendment right to "telephone access," citing *Johnson v. California*, 207 F.3d 650 (9th Cir. 2000), and the commissions collected amount to unconstitutional taxes on the exercise of that right, *see Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 577 (1983) (invalidating a tax on the "cost of paper and ink products consumed in the production of a publication" because it singled out the press for special treatment). Thus, plaintiffs argue, because the commissions should be considered taxes on the exercise of First Amendment rights, the Court must determine whether the "burden is necessary to achieve an overriding governmental interest." *Minneapolis Star*, 460 U.S. at 582.[12]

---

[11]  Plaintiffs rely on *McGuire v. Ameritech Services, Inc.*, 253 F. Supp. 2d 988 (S.D. Ohio 2003) and Judge Fitzgerald's opinion in similar cases in the Central District of California, *Salazar v. Los Angeles*, No. 15-CV-9003-MWF, Dkt. No. 48 (C.D. Cal. Sept. 26, 2016), which both deferred ruling on the state action doctrine issue until further factual development. Both courts found that it appeared to be a "question of fact as to whether, in giving Defendant counties the authority to regulate commissions from phone calls via section 4025(d), the State contemplated that Defendant counties would in turn establish phone calling systems on a monopolistic basis." Order, *Salazar*, at *31; *McGuire*, 253 F. Supp. 2d at 1017–18. Here, however, plaintiffs concede defendants' authority to enter into contracts on a monopolistic basis and dispute only their ability to charge allegedly "exorbitant" commissions. In any event, such a determination can be made at this time, given the parties' arguments, lack of allegations to the contrary, and the legislative history behind Penal Code section 4025.

[12]  As an initial matter, the parties dispute whether the challenged "commissions" should be considered "taxes" for the purposes of plaintiffs' First Amendment challenge. The cases upon which plaintiffs rely for this position are either in the context of actual taxes, or legislative or regulatory actions taken by the government, requiring payment of a licensing fee prior to being granted permission to partake in a constitutionally protected activity. *See Minneapolis Star*, 460 U.S. at 577; *see also Murdock v. Pennsylvania*, 319 U.S. 105, 109–10 (1943) (license tax on

To determine whether a regulation that impinges upon a First Amendment right violates the same, the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987) set forth the following four-factor test, namely whether: (i) there exists a valid, rational connection between the restriction and the legitimate governmental interest put forward to justify it; (ii) there are alternative means of exercising the right; (iii) accommodating the asserted right will have a significant negative impact on prison guards and other inmates, and on the allocation of prison resources generally; and (iv) the prison has access to obvious, easy alternatives to the restriction demonstrating that it is an exaggerated response to prison concerns. *Turner*, 482 U.S. at 89–90; *see also Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002). This analysis presupposes the impingement of a constitutional right. *See Valdez*, 302 F.3d at 1048–49 (applying *Turner* analysis where access to phones was essentially forbidden).

Contrary to plaintiffs' assertion, the Ninth Circuit has not recognized an independent right to telephone access for inmates. Rather, *Valdez* explicitly explained that the Ninth Circuit had only stated in *dicta* that inmates have a First Amendment right to telephone access and that those "pronouncements of its existence" were "obscure," failed to identify any "source of the right," and had "been conclusory and unnecessary to the [prior] decisions." *Id.* at 1048. In analyzing the

---

distribution of religious material); *Baldwin v. Redwood City*, 540 F.2d 1360, 1366 (9th Cir. 1976) (regulation imposing restrictions and requiring permits before homeowners and residents could post temporary political posters and signs); *TK's Video, Inc. v. Denton Cty.*, 24 F.3d 705, 707 (5th Cir. 1994) (licensing requirements for adult book and video stores); *Nat'l Awareness Found. v. Abrams*, 50 F.3d 1159, 1165 (2d Cir. 1995) (registration and annual fees for professional solicitors in the employ of professional fundraisers); *Sentinel Comm'cs Co. v. Watts*, 936 F.2d 1189, 1205 (11th Cir. 1991) (licensing fees and insurance requirements for placement of coin-operated news racks); *E. Conn. Citizen Action Grp. v. Powers*, 723 F.2d 1050, 1056 (2d Cir. 1983) (licensing fees to use forum for protesting). Defendants argue that such bear no relation to the purchase of services—namely ICS phone access—from private entities with whom the defendants have entered into contracts.

The Court finds that the characterization of the commissions as a "tax" or a "fee" is inconsequential, and the cases make no such distinction. Rather, the concern is whether the government is conditioning the exercise of a First Amendment right on the payment of a fee that is unconnected with the administrative costs of overseeing the exercise of that right or any other legitimate governmental interest. *See Minneapolis Star*, 460 U.S. at 582 (holding that "tax that burdens rights protected by the First Amendment cannot stand unless the burden is necessary to achieve an overriding governmental interest").

constitutional claim, the *Valdez* court reviewed the Supreme Court's and that of the Eleventh Circuit's examination of the same. *Id.* It then adopted the Eleventh Circuit's reasoning and defined the constitutional right as a "right to communicate with persons outside prison walls." *Id.* It then clarified that the "[u]se of a telephone provides a *means* of exercising this right." *Id.* (emphasis in original).

Here, the complaints do not sufficiently allege the impingement of the constitutional right as defined in *Valdez*.[13] While *Valdez* was decided in the context of summary judgment, at the time the Ninth Circuit had not yet defined the constitutional framework which now exists. Nonetheless, the factual context there is instructive. In *Valdez*, the plaintiff had spent four-and-a-half months in pretrial detention. *Valdez*, 302 F.3d at 1042. Approximately one month into his detention, state officials placed plaintiff in administrative segregation, during which he was "not permitted to make or receive any telephone calls, save a daily telephone call with his attorney," and even then, he had to submit a written request. *Id.* There, the restriction on telephone access was nearly absolute. Ultimately, after applying the *Turner* analysis, the Ninth Circuit held that no First Amendment violation existed because the "restriction" was rationally related to a legitimate governmental interest, and Valdez had alternative means of communicating with persons outside the prison walls, namely, receiving visitors and sending and receiving mail. *Id.* at 1049. Further, allowing access would have required the allocation of additional resources, and no easy alternatives existed to prevent him from informing his cohorts of the government's plans. *Id.*

In *Valdez*, the deprivation of access to telephone calls was essentially absolute, thereby necessitating an analysis of that restriction within the *Turner* framework. Similarly, in *Johnson*, which contained the *dicta* noted above, the Ninth Circuit opined:

> Although prisoners have a First Amendment right to telephone access, the right is subject to reasonable limitations arising from the legitimate penological and administrative interests of the prison system. There is no authority for the proposition that prisoners are entitled to a specific rate for their telephone calls

[13] Plaintiffs rely heavily on Judge Fitzgerald's order in the Central District cases. Order, *Salazar*, Dkt. No. 48. There, Judge Fitzgerald agreed with the plaintiffs that the motion to dismiss the First Amendment claims rested on the application of the *Turner* analysis, but he also found persuasive the noted *dicta*, which contains a reference to the threshold "right to telephone access in the jails." *Id.* at *16–18. This Court respectfully declines to join him.

> and the complaint alleges no facts from which one could conclude that the rate charged is so exorbitant as to deprive prisoners of phone access altogether.

*Johnson*, 207 F.3d at 656 (internal citation omitted). Within that context, the Ninth Circuit held that allegations regarding the inmate's mother, who was forced to cancel her phone service as a result of overcharges thereby "preventing her from making phone calls to the prison," were insufficient to raise a constitutional claim under the Fifth, Eighth, or Fourteenth Amendments. *Id.* at 653, 656. The *Johnson* court then suggested the possibility of a First Amendment claim where the rates charged are "so exorbitant as to deprive prisoners of phone access altogether." *Id.*

No such deprivation of communication has been alleged here. Plaintiffs have not alleged the imposition of any regulations or restrictions that prevent them from using the telephone for communications, *see Valdez*, 302 F.3d at 1049, nor have they alleged that the rates are "so exorbitant as to deprive [inmates] of access altogether," *see Johnson*, 207 F.3d at 656. That the commissions charged may result in higher phone rates, which, in turn, may reduce the frequency and length of phone calls made, does not constitute a governmental restriction on plaintiffs' constitutional rights.[14] No courts have recognized a constitutional right to unlimited communication by means of telephone calls with persons generally, let alone within the context of phone calls between inmates and those outside prison walls. *See Arsberry*, 244 F.3d at 565 ("The telephone, and the nation's telecommunications infrastructure more generally, are more commonly used for First Amendment purposes than prison phones are, but the federal courts do not use that fact as an excuse for bringing the taxation and regulation of telecommunications under comprehensive judicial surveillance in the name of free speech.").[15]

---

[14] Significantly, because the telephone companies themselves are not part of this litigation and the relief plaintiffs seek would only enjoin defendants from collecting commissions as part of their contractual arrangement with the telephone companies, the telephone companies could, in theory, continue charging the same "exorbitant" rates, retaining all profits without remitting a portion to the counties for the inmate welfare funds.

[15] Plaintiffs further argue that a standard lower than the *Turner* standard should apply to the call recipient plaintiffs because they are not in prison, and, therefore, the same governmental concerns are inapposite. Not so. Necessarily, each one of the calls at issue would involve a call recipient outside of prison. If the Court were to accept plaintiffs' position, it would render the entire *Turner* analysis nugatory in this context. In any event, the Court's ruling here is based on a finding that the commissions charged do not impinge upon or restrict the exercise of any First Amendment right. This finding applies equally to the inmate plaintiffs as it does to the call recipient plaintiffs.

20

Accordingly, the Court **GRANTS** defendants' motion in this regard.

### 2. *Fifth Amendment—Takings and Unconstitutional Conditions*

Plaintiffs have raised two related but doctrinally distinct Fifth Amendment claims. Specifically, plaintiffs allege the ICS payments unreasonably burden the "exercise of Fifth Amendment rights to just compensation, unreasonably force[] [p]laintiffs and the classes alone to bear public costs that should be borne by the public as a whole, and additionally bear no reasonable nexus or rough proportionality to the required payments and the cost to, or burden or effect on" the county defendants. (*See* SAC ¶¶ 74–75.)[16] The Court addresses each aspect of the claim—*i.e.* whether there exists (1) a taking, and then (2) an unconstitutional condition premised on such taking.

First, with respect to takings, the Ninth Circuit engages in a two-step process to determine whether a "taking" has occurred, namely whether: (i) the subject matter is "property" within the meaning of the Fifth Amendment; and (ii) there has been a "taking" of that property for which compensation is due. *Engquist v. Or. Dep't of Ag.*, 478 F.3d 985, 1001–02 (9th Cir. 2007); *see also McIntyre v. Bayer*, 339 F.3d 1097, 1099 (9th Cir. 2003) (holding that a plaintiff must first establish a constitutionally protected interest to state a claim under the Takings Clause). The parties dispute whether money collected for the performance of services constitutes "property" sufficient to sustain a Takings claim under the Fifth Amendment. The Court finds that it does not.

The Supreme Court addressed this issue in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998). There, in a plurality opinion, Justice Kennedy concluded that the Coal Act, which "simply imposes an obligation to perform an act, the payment of benefits," does "not operate upon or alter an identified property interest, and it is not applicable to or measured by a property interest." *Id.* at 540 (Kennedy, J., concurring in part, dissenting in part). While the Ninth Circuit has not yet done so, several courts in other circuits have interpreted *Eastern Enterprises* as holding that the "mere imposition of an obligation to pay money . . . does not give rise to a claim under the

---

[16] At oral arguments, plaintiffs attempted to clarify that they were only raising one claim, namely that there exists an unconstitutional condition that is coercive because it involves a "taking" of their money to exercise their right to communicate with others. Nonetheless, given the lack of clarity, the Court addresses both.

Takings Clause of the Fifth Amendment." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1340 (Fed. Cir. 2001) (en banc); *see also W. Virginia CWP Fund v. Stacy*, 671 F.3d 378, 387 (4th Cir. 2011); *Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 659, 674 (3d Cir. 1999) ("[W]e are bound to follow the five-four vote against the [T]akings claim in *Eastern* . . . ."); *Parella v. Ret. Bd. of the R.I. Employees' Ret. Sys.*, 173 F.3d 46, 58 (1st Cir. 1999).[17] The Court adopts the same analysis here, and finds that the charging of fees does not constitute a violation of the Takings Clause.

---

[17] Plaintiffs cite four cases which they argue support their position that an obligation to pay money gives rise to a Takings claim under the Fifth Amendment. However, two of these four cases pre-date the Supreme Court's opinion in *Eastern Enterprises*, which was decided on June 25, 1998. *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 172 (1998) (decided June 15, 1998 and holding that the interest accrued in certain funds was the private property of the owner, but explicitly expressed no view as to whether such funds were taken by the state); *Webb's Fabulous Pharms., Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) (holding that a county violated the Takings Clause in taking interest earned on interpleader funds). More importantly, neither of these cases is analogous to the case at hand. Both involve a governmental entity taking for its own use monetary interest generated from a fund. In discussing *Webb's Fabulous*, upon which *Phillips* relies, the dissenting justices in *Eastern Enterprises* explained thus:

> The Court has also made clear that the Clause can apply to monetary interest generated from a fund into which a private individual has paid money. But the monetary interest at issue there arose out of the operation of a specific, separately identifiable fund of money. And the government took that interest for itself. Here there is no specific fund of money; there is only a general liability; and that liability runs not to the Government, but to third parties.

*E. Enters.*, 524 U.S. at 555 (Breyer, J., dissenting) (internal citation omitted); *see also id.* at 539 ("The Coal Act does not appropriate, transfer, or encumber an estate in land (*e.g.*, a lien on a particular piece of property), a valuable interest in an intangible (*e.g.*, intellectual property), or even a bank account or accrued interest. The law simply imposes an obligation to perform an act, the payment of benefits.") (Kennedy, J., concurring in part, dissenting in part). The third case was issued by the Ninth Circuit only two months after *Eastern Enterprises*, and is similarly in the context of taking interest income payments from a fund. *Schneider v. Cal. Dep't of Corrections*, 151 F.3d 1194, 1201 (9th Cir. 1998) (finding that state's appropriation of interest income payments implicated Takings Clause). Finally, the last case addressed whether money was a property interest for purposes of a procedural due process claim rather than a Takings claim. *McGuire*, 253 F. Supp. 2d at 1004.

Furthermore, *McGuire* and other cases have also recognized that where, as here, the payment is voluntary, there is no such taking. *Id.* ("The prospective recipient of a collect call is in complete control over whether she chooses to accept the call and thereby relinquish her money to pay for it. There is no taking of which to speak, such as where the government confiscates property or forecloses its commercial use by fiat or legislation, and any argument that the State has created a property interest in free or cheap collect calls would not be well taken."); *see also Managed Pharm. Care v. Sebelius*, 716 F.3d 1235, 1252 (9th Cir. 2013) (rejected Takings claim related to reimbursement rates because participation in Medicaid is voluntary); *Godoy v. Horel*, No. 09-CV-4793-PJH, 2010 WL 890148, at *2–3 (N.D. Cal. Mar. 8, 2010), *aff'd*, 442 F. App'x 326 (9th Cir. 2011) (finding no taking where defendants' raised the price of coffee at the prison canteen because plaintiffs were aware of the prices and authorized expenditures).

Second, the doctrine of unconstitutional conditions holds that the "government ordinarily may not grant a benefit on the condition that the beneficiary surrender a constitutional right, even if the government may withhold that benefit altogether." *See* 16A Am. Jur. 2d Con. Law § 411 (2017); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2595 (2013) (holding that the "government may not deny a benefit to a person because he exercises a constitutional right" (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983))).  Plaintiffs argue that the unconstitutional condition here is that the government is "taking" their money as a cost of their exercise of their First Amendment rights to utilize the phones in prison.  Plaintiffs rely heavily on the Supreme Court's decision in *Koontz*.  However, that case is inapposite here.  *Koontz*, 133 S. Ct. at 2594–95 (holding that certain conditions placed on land use permits constitute unconstitutional conditions).  Plaintiffs have failed to allege any unconstitutional condition, and the Court finds that no set of facts consistent with plaintiffs' pleading could make out such a claim.  The counties are not here denying or granting any benefits on the condition that plaintiffs surrender a constitutional right.

Accordingly, because the Court finds that amendment as to the Fifth Amendment claims would be futile, the Court **GRANTS** defendants' motion.

### 3.    *Fourteenth Amendment—Equal Protection*

Plaintiffs raise this claim only with respect to the Call Recipient Class rather than the Inmate Class, claiming two bases in support of this cause of action:  First, the fee is being imposed on the Call Recipient Class in violation of the Equal Protection Clause because there is no rational basis for distinguishing between that class and the public-at-large; and second, an Equal Protection Clause claim exists because the fee violates the First Amendment.

**Similarly Situated:**  Plaintiffs argue that the Call Recipients are similarly situated to the general public because, unlike the general public and only because they are communicating with inmates, plaintiffs are forced to pay commissions, which are essentially taxes that no other resident

1    must pay.  Specifically, plaintiffs cite to Proposition 26 of the California constitution, which sets

2    forth certain requirements before a government can impose a tax increase.[18]

3        By way of background, Proposition 26 amended the California constitution to require a

4    two-thirds supermajority to enact any "change in state statute which results in any taxpayer paying

5    a higher tax."  Cal. Const. Art. 13A § 3.  The amendment goes on to define taxes as any "levy,

6    charge, or exaction of any kind imposed by the State," excepting certain classes of charges,

7    including charges for specific government services not provided to others so long as such charge

8    "does not exceed the reasonable costs to the State of providing the service or product to the

9    payor."  Id.[19]  However, whether the fees are impermissible taxes under the California constitution

10   would not establish plaintiffs as similarly situated to the public-at-large, but rather simply

11   invalidate the fees altogether for everyone.[20]

12       Plaintiffs, unlike the public-at-large, make and receive phone calls using the ICS, and

13   plaintiffs do not otherwise claim that they belong to a constitutionally protected group.  See, e.g.,

14   Kadrmas v. Dickinson Pub. Schools, 487 U.S. 450, 462 (1988) (rejecting an Equal Protection

15   claim and stating thus:  "[W]e think it is quite clear that a State's decision to allow local school

16   boards the option of charging patrons a user fee for bus service is constitutionally permissible.

---

18    In the related Central District cases, Judge Fitzgerald credited plaintiffs' arguments regarding Proposition 26, finding that state courts should be given the opportunity to address the issue as to whether the fees are impermissible taxes under Proposition 26, and if so, then plaintiffs have successfully pled an Equal Protections claim.  Order, Salazar, Dkt. No. 59, at *8–10 (Dec. 20, 2016).

19    Plaintiffs represent that they are challenging the fees imposed here in parallel state court proceedings as impermissible taxes pursuant to Proposition 26.  In a joint statement filed in the Central District cases, the parties represented that these cases have been consolidated with the five Central District cases in those parallel state court proceedings.  Joint Statement, Salazar, Dkt. No. 69 (July 31, 2017).  They further represented that the plaintiffs filed a consolidated complaint on July 21, 2017, and that defendants were in the process of reviewing such complaint.  Id.

20    Plaintiffs further argue that the commissions are used for "either the Inmate Welfare Fund or for general jail maintenance," and complain that plaintiffs pay a disproportionately higher amount to support the same simply because they are communicating with inmates.  (Dkt. No. 46 at 55.)  As an initial matter, as set forth above, the commissions collected by the counties must be used for special purposes within the prisons.  If the counties are violating that mandate, plaintiffs may have claims under state law.  However, defendants' ultimate use of these commissions is, in these circumstances, not relevant with regard to an Equal Protection challenge.  The relevant inquiry is whether they are similarly situated to the public-at-large.  For the reasons set forth herein, they are not.

24

The Constitution does not require that such service be provided at all, and it is difficult to imagine why choosing to offer the service would entail a constitutional obligation to offer it for free."). Thus, plaintiffs fail to state an Equal Protection claim based on the theory that they are similarly situated to the general public, but are discriminated against without a rational basis by the imposition of these commissions.

**Fundamental First Amendment Right:** An Equal Protection Clause challenge on the basis of the First Amendment is predicated on the theory that the government has "grant[ed] the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Thus, plaintiffs must show that the county is somehow discriminating against certain types or contents of speech.[21] Plaintiffs attempt to argue that the limitation here is not content neutral because it limits and burdens speech associated with those accused or convicted of a crime. However, plaintiffs fail to explain how such is content-based discrimination. The cases upon which plaintiffs rely offer no support for that position. *See Texas State Troopers Ass'n, Inc. v. Morales*, 10 F. Supp. 2d 628, 637 (N.D. Tex. 1998) (finding that the "curfew provision is content based in that it applies to a specific type of solicitation—that is, it does not affect charities that are not connected with law enforcement"); *Blair v. Shanahan*, 775 F. Supp. 1315, 1325 (N.D. Cal. 1991), *appeal dismissed and remanded*, 38 F.3d 1514 (9th Cir. 1995) *and opinion vacated on other grounds*, 919 F. Supp. 1361 (N.D. Cal. 1996) (finding that a restriction on begging is not content-neutral because it does not treat all who "approach others and speak to them first" in a similar manner). Here, everyone, regardless of the views they wish to express, is treated similarly by the county prison systems vis-a-vis the phone services they provide. Thus, an Equal Protection claim based on a First Amendment violation cannot be sustained.

---

[21] Plaintiffs also argue that an Equal Protection claim based on a First Amendment violation need not involve view point discrimination, citing *United States v. Nat'l Treasury Empls. Union*, 513 U.S. 454 (1995) for the proposition that actions that infringe on protected speech can violate the First Amendment, even if they are content-neutral. *National Treasury*, however, does not involve an Equal Protection claim. While an independent First Amendment claim can implicate other impingements of free speech, plaintiffs provide no authority that an Equal Protection claim premised on the First Amendment can be based on content neutral restrictions.

Accordingly, the Court **GRANTS** defendants' motion as to this claim.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** defendants' motion and **DISMISSES WITH PREJUDICE** all claims in these actions, except for plaintiffs' First Amendment claim. Out of an abundance of caution, the Court provides leave to amend as to that claim only to determine whether any amendment can state a claim. Within twenty-eight (28) days from the issuance of this Order, plaintiffs must file either (i) amended complaints or (ii) a statement indicating their intent to rest on the current pleadings so that judgment may be entered.

The Court **RESCHEDULES** the case management conferences in each action from **August 14, 2017** to **September 18, 2017** at **2:00 p.m.**

This Order terminates the following docket numbers in each case as follows:

*Banks v. San Mateo*, No. 16-CV-4455: Docket Numbers 38, 39, and 53.

*Thatcher v. Santa Clara*, No. 16-CV-4781: Docket Numbers 32, 33, and 44.

*Harris v. Contra Costa*, No. 16-CV-4795: Docket Numbers 26, 27, and 39.

*Clark-Russell v. Alameda*, No. 16-CV-4816: Docket Numbers 26, 27, and 37.

**IT IS SO ORDERED.**

Dated: August 10, 2017

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

26